Stephen A. SPETALIERI, Plaintiff,

v.

Michael KAVANAUGH, individually, Robert Senor, individually, T.R. Gallo, individually, Kay Quick, individually, McShell Moye–Clarke, individually, Willie Hardin, individually, Paul Watzka, individually, Joan Washington, individually, the City of Kingston, New York, and the County of Ulster, Defendants.

Joan Williams–Washington,
Third–Party Plaintiff,

v.

National Association for the Advancement of Colored People, New York State Conference of NAACP Branches, Hazel N. Dukes, individually and as President of the New York State Conference of NAACP Branches, Ulster County Branch of NAACP, McShell Moye–Clarke, individually and as President of the Ulster County Branch of the NAACP, Third–Party Defendants.

No. 96–CV–1650.

United States District Court,
N.D. New York.

Dec. 22, 1998.

---

Lovett, Gould Law Firm, White Plains, NY, Jonathan Lovett, of counsel, for plaintiff.

Maynard, O'Connor Law Firm, Albany, NY, Michael Catalinotto, of counsel, for defendants Kavanagh and Ulster County.

Cook, Tucker Law Firm, Kingston, NY, Robert D. Cook, of counsel, Office of James H. Kerr, New Paltz, NY, James H. Kerr, of counsel, for defendants Senor, T.R. Gallo, Quick, Moye–Clarke, Hardin, Watzka, and City of Kingston.

Iseman, Cunningham Law Firm, Albany, NY, Frederick C. Riester, of counsel, for defendant Washington, for Third–Party Plaintiff Washington.

Bouck, Holloway Law Firm, Albany, NY, David B. Cabaniss, of counsel, for Third–Party Defendants National, Association for the Advancement of Colored People, Hazel N. Dukes.

## MEMORANDUM—DECISION & ORDER

McAVOY, Chief Judge.

Plaintiff commenced an action against the defendants pursuant to 42 U.S.C. § 1983 alleging retaliation for the exercise of his First Amendment rights (First Cause of Action); unlawful search and seizure in violation of the Fourth Amendment (Second Cause of Action); deprivation of his liberty and property interests without being afforded due process of law in violation of the Fourteenth Amendment (Third and Fifth Causes of Action); violation of the Fourteenth Amendment's guarantee of the Equal Protection of the Laws (Fourth Cause of Action); and violations of his right of privacy under the Fourteenth Amendment and Article 6–A of the New York State Public Officers Law (Seventh Cause of Action). Plaintiff also asserts claims pursuant to New York State Executive Law § 296 (Sixth Cause of Action) and a common-law claim for defamation (Eighth Cause of Action). Defendant Joan Washington brings a Third–Party action against the National Association for the Advancement of Colored People, Inc. ("NAACP"), the Ulster County branch of the NAACP, Hazel N. Dukes, McShell Moye-Clarke and the New York State Conference of NAACP branches.

Presently before the Court are defendants' motions pursuant to FED.R.CIV.P. 56 seeking dismissal of the Complaint in its entirety, plaintiff's cross-motion pursuant to FED. R.CIV.P. 15 for leave to amend the Complaint to assert violations of 18 U.S.C. § 2510, *et seq.*, and the New York State Const., Art. I, § 12, and third-party defendants' motion for summary judgment seeking dismissal of the Third–Party Complaint in its entirety.

## I. BACKGROUND

At all times relevant hereto, Plaintiff Steven A. Spetalieri ("plaintiff") was the head of the Narcotics Bureau for the City of Kingston Police Department ("KPD"). Defendant Joan Williams Washington ("Washington") is a resident of the City of Kingston and lives in close proximity to plaintiff's friend, Rachel Bloom ("Bloom"). Washington is a member of the neighborhood watch program and has frequent contact with the KPD. Washington owns a scanner that she uses to monitor police and fire department activity, and radio communications of the City of Kingston (the "City") Department of Public Works, where her husband is employed.

In the spring or summer of 1996, Washington's scanner picked up telephone conversations between plaintiff and Bloom. Bloom was using a cordless telephone.[1] Plaintiff, on the other hand, was using a traditional, hard-wired telephone.[2] In the telephone conversations, plaintiff frequently used profanity and spoke in a denigrating manner about African–Americans.[3]

Washington apparently recognized plaintiff as a party to the conversations. Because she believed that plaintiff's speech was inappropriate, especially in light of his position as head of the KPD Narcotics Bureau, Wash-

---

1. Cordless telephones transmit radio signals between the handset and the base unit. These radio signals can be intercepted by scanners or other radio receivers, such as baby monitors. Where at least one of the participants is using a cordless telephone, the person intercepting the signal can hear all of the participants to the conversation.

2. Telephone conversations in which all participants are using traditional, hard-wired telephones cannot be intercepted by scanners or other radio receivers.

3. Among other things, plaintiff frequently referred to African–Americans as "niggers," stated

that three out of four African–Americans are "destined to go to jail," and further stated that he despised African–Americans moving into his neighborhood. Plaintiff also stated that "I'll be the first one to admit that I'm prejudice against fuckin niggers. I'll be the first one to admit it." *See* Transcript of Tel. Conv. Annexed as Exhibit "T" to the July 24, 1998 Aff. of Leslie Neustadt, Esq., and the copy of the taped communication annexed as Exhibit "B" to the Memo. of Law in Support of Summary Judgment by Defendants Senor, Gallo, Quick, Harden, Watzka, and City of Kingston.

ington locked her scanner on the particular frequency that received plaintiff's telephone conversation and tape recorded three telephone conversations (two of which were between plaintiff and Bloom).[4]

Washington did not do anything with the tape until on or about July 12, 1996, when she gave the tape to Defendant McShell Moye–Clarke ("Clarke"), president of the Kingston Branch of the NAACP. Washington apparently urged Clarke to listen to the tape and take appropriate action. Washington, however, did not want to be identified as the source of the tape for fear of reprisal. As a condition of obtaining the tape, Clarke apparently promised Washington that the NAACP would protect her. Clarke listened to the tape and played it for other members of the NAACP.

On July 15, 1996, Clarke and other members of the NAACP delivered the tape to District Attorney Investigator Junious Harris ("Harris") of the Ulster County District Attorney's Office. Clarke did not advise Harris of the source of the tape and claimed that the recording came from conversations that had been inadvertently heard over someone's television. Clarke also apparently stated that she did not know the source of the tape, but that she found it in her mailbox.

Defendant Michael Kavanagh, the Ulster County District Attorney ("Kavanagh" or the "District Attorney"), also listened to a portion of the tape. Kavanagh directed Harris to copy the tape and have Clarke deliver the tape to Defendant Deputy Police Chief Paul Watzka ("Watzka"), which she did, again claiming that the tape had been anonymously left in her mailbox. Kavanagh also contacted Watzka and recommended that plaintiff be suspended or put on limited duty pending an internal investigation. Kavanagh immediately drafted a memorandum to all Assistant District Attorneys requesting a list of all County Court cases in which plaintiff played a key role in the investigation and prosecu-

tion. Concerned over plaintiff's credibility as a witness, Kavanagh believed that the tape and any investigation thereof would have to be disclosed pursuant to *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), in the prosecutions of African–Americans in which plaintiff was going to testify. Accordingly, Kavanagh decided not to use plaintiff as a witness in any criminal cases prosecuted by his office. As a result, the District Attorney's office reviewed those cases in which plaintiff would be an essential witness and offered plea bargains.

Watzka informed the Chief of Police for the KPD (the "Chief") that he received a tape recording from the NAACP involving a police officer making racial slurs. The Chief advised Watzka to contact Defendant City of Kingston Mayor T.R. Gallo ("Gallo"). Gallo stated that a meeting of the Board of Police Commissioners should be convened and that Watzka should review the matter and conduct an investigation.

A meeting of the Board of Police Commissioners (the "Board") was convened on July 16, 1996. Present at the meeting were, *inter alios,* Defendants Kay Quick ("Quick"), a member of the Board; Gallo; and Reverend Willie Hardin ("Hardin"), Director of Human Rights for the City of Kingston. The Board recommended that plaintiff be suspended for thirty days without pay and instructed Watzka to investigate the origin of the tape. Upon the expiration of the thirty-day suspension, the Board met again and continued the suspension with pay.

Beginning on July 16, 1996, articles began to appear in local newspapers regarding the taped conversations.[5] Various reporters contacted Kavanagh who publicly commented that an avowed racist should not be in law enforcement and urged either that plaintiff retire from the KPD or be terminated. Gallo and Clarke also commented to the press.

After the Board meeting, plaintiff was served with Disciplinary Charges and a hear-

---

**4.** The parties dispute when Washington taped the telephone conversations. Plaintiff claims that Washington recorded the conversations during the spring and/or summer of 1996 while defendants maintain that it was June 1996. The precise date of the recording(s), however, is irrele-

vant for purposes of determining the motions for summary judgment.

**5.** All defendants deny having provided the tape, or the substance of the tape's contents, to the media until after it was common knowledge.

ing officer was appointed to review the matter. Plaintiff ultimately negotiated a settlement with the City in satisfaction of the Disciplinary Charges whereby plaintiff agreed to retire from the KPD in exchange for certain financial compensation.

Thereafter, plaintiff commenced the instant litigation against the defendants asserting various claims pursuant to 1983, a claim pursuant to New York Executive Law § 296, and a common-law claim for defamation. In response, Washington filed a Third–Party Complaint against the NAACP, Hazel Dukes, President of the New York State Conference of NAACP Branches, and Clarke, as president of the Ulster County Branch of the NAACP (the "third-party defendants") claiming that the third-party defendants had agreed to defend and indemnify her for any damages, attorneys' fees and other expenses she might incur by reason of having given the tape to Clarke.

The defendants and third-party defendants have now moved for summary judgment dismissing the Complaint and Third–Party Complaint, respectively, in their entirety. Plaintiff has cross-moved for leave to amend the Complaint to add causes of action for violations of 18 U.S.C. § 2510, *et seq.* (the "Wiretap Statute") and Article I, § 12 of the New York State Constitution.

## II. DISCUSSION

### A. Summary Judgment Standard

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, judgment may be entered in favor of the moving party if "there is no genuine issue as to any material fact and [ ] the moving party is entitled to judgment as a matter of law." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). On a motion for summary judgment, all facts must be construed in favor of the nonmoving party. *Id.; Buttry v. General Signal Corp.*, 68 F.3d 1488, 1492 (2d Cir.1995). Where the moving party has supported the motion by affidavits and/or documentary evidence, the non-movant "may not rest upon mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as other-

wise provided in rule [56], must set forth specific facts showing that there is a genuine issue [of material fact] for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." FED.R.CIV.P. 56(e); *BellSouth Telecommunications, Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir.1996). With this standard in mind, the Court will now address defendants' and third-party defendants' motions for summary judgment.

### B. Section 1983 Claims Against Clarke and Washington

Defendants Clarke and Washington move to dismiss the section 1983 claims against them on the ground that they did not act under "color of law". Plaintiff counters that Washington illegally recorded portions of his conversations between himself and Bloom, turned the tapes over to Clarke with the expectation that plaintiff would at least receive some counseling, and acted in concert with the KPD as a member of a neighborhood watch group. Plaintiff further alleges that Clarke turned the tape over to Kavanagh and Watzka and later to the press and continued to comment on the tape to the media.

■ It is elementary that "[a]n action under § 1983 cannot ... be maintained unless the challenged conduct was attributable ... to a person acting under color of state law." *Chan v. City of New York*, 1 F.3d 96, 106 (2d Cir.1993), *cert. denied*, 510 U.S. 978, 114 S.Ct. 472, 126 L.Ed.2d 423 (1993); *see also Hertz Corp. v. City of New York*, 1 F.3d 121, 133 (2d Cir.1993), *cert. denied*, 510 U.S. 1111, 114 S.Ct. 1054, 127 L.Ed.2d 375 (1994). Here, the evidence unmistakably demonstrates that Washington and Clarke neither were employed by nor agents of the State of New York, Ulster County, or the City. At all times relevant hereto, Washington was unemployed. Clarke is self-employed as a day care provider and is President of the Kingston Branch of the NAACP.

■ That Clarke brought the tape to the District Attorney's Office and the KPD is insufficient to constitute state action for purposes of § 1983. "[A] private party does not

act under color of state law when she merely elicits but does not join in an exercise of official state authority." *Auster Oil & Gas, Inc. v. Stream,* 764 F.2d 381, 388 (5th Cir. 1985), *cert. denied,* 486 U.S. 1027, 108 S.Ct. 2007, 100 L.Ed.2d 237 (1988); *see also Tarkowski v. Robert Bartlett Realty Co.,* 644 F.2d 1204, 1208 (7th Cir.1980) ("A private person does not conspire with a state official merely by invoking an exercise of the state official's authority."); *Daniel v. Ferguson,* 839 F.2d 1124, 1130 (5th Cir.1988) (" 'The execution by a private party of a sworn complaint, which forms the basis for an arrest, is, without more, not sufficient to make that party's acts state action.' ") (quoting *Sims v. Jefferson Downs Racing Ass'n.,* 778 F.2d 1068, 1078–79 (5th Cir.1985)); *see also Dunton v. County of Suffolk,* 729 F.2d 903, 910 (2d Cir.1984); *Grow v. Fisher,* 523 F.2d 875, 879 (7th Cir.1975) (private person's filing of a criminal complaint is not under color of state law).

■ It is true that, under certain circumstances, a "private party's joint participation with a state official in a conspiracy to [deprive him of his federal rights] would constitute . . . ' "under color" of law for purposes of [§ 1983]' " *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 102 S.Ct. 2744, 2750, 73 L.Ed.2d 482 (1982) (quoting *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 1604, 1606, 26 L.Ed.2d 142 (1970)). However, plaintiff must "allege with at least some degree of particularity overt acts which defendants engaged in which were reasonably related to the promotion of the claimed conspiracy." *Powell v. Workmen's Compensation Bd. of State of New York,* 327 F.2d 131, 137 (2d Cir.1964). "A complaint containing only conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss." *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (quoting *Leon v. Murphy,* 988 F.2d 303, 311 (2d Cir.1993)).

■ Here, neither Washington nor Clarke jointly participated with the other defendants to deprive plaintiff of his Constitutional rights. The deposition testimony reveals that none of the defendants were aware that Washington was recording plaintiff's telephone conversations, that none of the defendants asked or encouraged her to do so, and that none of the defendants otherwise acted together to harm plaintiff prior to the taping of the telephone conversation. Plaintiff himself admitted at his deposition that he had no factual evidence of any conspiracy to deprive him of his constitutional rights. Spetalieri Dep., at 51–52, 54–55. Further, once the tape had been delivered to the District Attorney and the KPD, neither Washington nor Clarke had any involvement with plaintiff's suspension and ultimate retirement.

■ Washington's participation in a neighborhood watch group does not transform her actions into state action. Washington acted solely as a private citizen. *See, e.g., Weber v. Bland,* 1998 WL 341823, at *4 (N.D.Ill. June 17, 1998) (member of neighborhood watch group "is best described as a private citizen who was an eyewitness to the [crime] in the course of her voluntary duties"); *Bangerter v. Orem City Corp.,* 797 F.Supp. 918, 921 (D.Utah 1992) ("a neighborhood watch committee is typically composed entirely of neighbors who set out to scrutinize and police a particular identified problem."), *rev'd on other grounds,* 46 F.3d 1491 (10th Cir.1995). Thus, the section 1983 claims against Clarke and Washington must be dismissed.

### C. First Amendment Retaliation Claim

Plaintiff's First Cause of Action alleges that "[d]efendants' conduct and/or retaliatory conduct violated Plaintiff's right to free speech as guaranteed him by . . . the First Amendment to the United States Constitution, 42 U.S.C. § 1983." Complaint, ¶ 28. The Defendants County of Ulster and Kavanagh (collectively the "County Defendants"), and Senor, Gallo, Quick, Hardin, Watzka and the City (collectively the "City Defendants") move to dismiss on the grounds that plaintiff was not engaged in protected speech and that the potential disruption to the operation of the District Attorney's Office and the KPD outweighs plaintiff's right of free speech.

Plaintiff responds that his conversations touched upon matters of public concern that outweigh defendants' interests in the operation of their respective offices. Plaintiff as-

serts that he was engaged in a philosophical discussion regarding race relations in the community. Specifically, plaintiff alleges that he was attempting to explain the point of view of a neighbor who had complained about having African–American children running around on her property, that he was explaining "the difference between black people and niggers," Spetalieri Dep., at 96, and that he was expressing his concern "that black children are deprived in nature and society holds them back." *Id.*, at 104. Plaintiff further responds that it is defendants' own fault that their respective offices have been undermined because they failed to investigate the context of the conversations on the tape, failed to inquire whether plaintiff had exhibited racial bias or animus on the job, and released the tape to the media thereby creating a public fanfare surrounding the incident.

■ A public employee's freedom of speech is not absolute. *Heil v. Santoro,* 147 F.3d 103, 109 (2d Cir.1998) (citing *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)). "[T]he government has a legitimate interest in 'promoting the efficiency of the public services it performs through its employees.'" *Id.* (quoting *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); citing *Rankin v. McPherson,* 483 U.S. 378, 384, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987); *Connick,* 461 U.S. at 142, 103 S.Ct. 1684, 75 L.Ed.2d 708).

> Government agencies are charged by law with doing particular tasks. Agencies hire employees to help do those tasks as effectively and efficiently as possible. When someone who is paid a salary so that [he] will contribute to an agency's effective operation begins to do or say things that detract from the agency's effective operation, the government employer must have some power to restrain [him].

*Waters v. Churchill,* 511 U.S. 661, 114 S.Ct. 1878, 1887, 128 L.Ed.2d 686 (1994). Accordingly, a plaintiff asserting government conduct in retaliation for the exercise of free speech must demonstrate that "(i) he has an interest protected by the First Amendment; (ii) the defendant's actions were motivated by

or substantially caused by the plaintiff's exercise of that right; and (iii) the defendant's action effectively chilled the exercise of the plaintiff's First Amendment rights." *Connell v. Signoracci,* 153 F.3d 74, 79 (2d Cir.1998).

If the plaintiff is able to demonstrate the above factors, "the government may nonetheless escape liability" by demonstrating: (1) "that it reasonably believed that the speech would potentially interfere with or disrupt the government's activities and . . . that the potential disruptiveness was sufficient to outweigh the First Amendment value of that speech," *Heil,* 147 F.3d at 109 (citing *Waters,* 511 U.S. 661, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994) (plurality opinion); *Jeffries v. Harleston,* 52 F.3d 9, 13 (2d Cir.), *cert. denied,* 516 U.S. 862, 116 S.Ct. 173, 133 L.Ed.2d 114 (1995)), or (2) "that it would have taken the same adverse action in the absence of the protected speech." *Id.* (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *White Plains Towing Corp. v. Patterson,* 991 F.2d 1049, 1059 (2d Cir.), *cert. denied,* 510 U.S. 865, 114 S.Ct. 185, 126 L.Ed.2d 144 (1993); *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994); *Sher v. Coughlin,* 739 F.2d 77, 82 (2d Cir.1984)).

### 1. Whether Plaintiff's Speech was a Matter of Public Concern

■ Whether speech is of public concern is a matter of law to be decided by the Court, *Sheppard v. Beerman,* 18 F.3d 147, 151 (2d Cir.1994), and "must be determined by the content, form, and context of a given statement." *Connick,* 461 U.S. 138, 103 S.Ct. at 1690. A discussion regarding racial relations or discrimination is a matter of public concern entitled to the full protection of the First Amendment. *See, e.g., Connick,* 461 U.S. 138, 103 S.Ct. at 1691 n. 8 (speech protesting racial discrimination is "inherently of public concern."); *Calvit v. Minneapolis Public Schools,* 122 F.3d 1112, 1117 (8th Cir. 1997) (criticism of school policy as race based is a matter of public concern).

■ It is questionable whether, here, in light of the actual conversation, its content, form and context, plaintiff was actually engaged in such a "philosophical" discussion.

On the one hand, plaintiff spoke as a private citizen discussing racial relations. *See Mt. Healthy,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471. Although plaintiff used deplorable language throughout his conversation and made derogatory racial comments, "[t]he inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern." *Rankin v. McPherson,* 483 U.S. 378, 107 S.Ct. 2891, 2898, 97 L.Ed.2d 315 (1987). On the other hand, a review of the taped telephone conversations reveal that plaintiff was discussing his own personal interests regarding African–Americans moving into the neighborhood and his personally prejudicial views regarding the likely criminal activity of African–Americans. Further, there is no evidence that plaintiff's "motivation in discussing race relations in the neighborhood was to bring the issue to the public's attention," *Lawrenz v. James,* 852 F.Supp. 986, 992 (M.D.Fla.1994), *aff'd,* 46 F.3d 70 (11th Cir.1995), or that his "primary aim" was to engage in a public discussion of race discrimination or race relations. *See Tiltti v. Weise,* 155 F.3d 596, 603 (2d Cir.1998); *Ezekwo v. New York City Health & Hosps. Corp.,* 940 F.2d 775, 781 (2d Cir.1991), *cert. denied,* 502 U.S. 1013, 112 S.Ct. 657, 116 L.Ed.2d 749 (1991). Nevertheless, because the Court must draw all reasonable inferences in favor of plaintiff and because his speech addressed a matter traditionally considered of public concern, and because his speech, even if made in private, cannot easily be separated from his position as a public officer, the Court concludes that his speech is a matter of public concern. *See, e.g., Denver Area Educational Telecommunications Consortium, Inc. v. Federal Communications Comm'n,* 518 U.S. 727, 116 S.Ct. 2374, 2416, 135 L.Ed.2d 888 (1996) (indecent cable programming entitled to marginal free speech protection); *New York v. Ferber,* 458 U.S. 747, 102 S.Ct. 3348, 3367, 73 L.Ed.2d 1113 (1982) (marginal speech not entitled to full protection of the First Amendment) (Stevens, J. concurring); *compare Moore v. City of Kilgore,* 877 F.2d 364, 369 (5th Cir.), *cert.*

*denied,* 493 U.S. 1003, 110 S.Ct. 562, 107 L.Ed.2d 557 (1989).

## 2. County Defendants

Although plaintiff's speech is protected by the First Amendment, he has failed to establish a *prima facie* case of retaliation against the County Defendants. The County Defendants did not subject plaintiff to any adverse action or injury, or otherwise chill the exercise of plaintiff's First Amendment rights. *See, e.g., Blum v. Schlegel,* 18 F.3d 1005, 1010 (2d Cir.1994); *Jeffries,* 52 F.3d at 13; *Hynes v. Squillace,* 143 F.3d 653, 657 (2d Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 246, 142 L.Ed.2d 202 (1998); *Connell,* 153 F.3d at 79. Here, plaintiff was an employee of the City. While Kavanagh recommended that plaintiff be suspended and called for his retirement or termination, the County Defendants did not employ plaintiff and did not have the authority to discipline or terminate him. Similarly, Kavanagh's decision not to use plaintiff as a witness in any criminal prosecutions did not affect plaintiff's employment or otherwise injure him. Even if plaintiff did suffer a Constitutional injury as a result of the County Defendants' conduct, Kavanagh's decisions not to use plaintiff as a witness and to offer plea agreements in all cases in which plaintiff was a key investigator or witness are intimately related to the judicial phase of the criminal process and would entitle Kavanagh to absolute immunity. *Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976); *Smith v. Garretto,* 147 F.3d 91, 94 (2d Cir.1998).

Further, the County Defendants acted because of the potential for disruption to the District Attorney's office, not in retaliation for plaintiff's speech. Kavanagh had a legitimate fear that the taped telephone conversation would have to be disclosed to African–American criminal defendants pursuant to *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215, and, therefore, utilizing plaintiff as a witness could have a deleterious effect on the County's criminal prosecutions. *See United States v. Avellino,* 136 F.3d 249, 255 (2d Cir.1998).[6] The evidence clearly in-

---

**6.** Kavanagh analogizes his fear to the negative impact Detective Mark Fuhrman had on the O.J.

Simpson trial once Fuhrman's racial bias was revealed in court. It was not unreasonable for

dicates that Kavanagh was concerned over the prosecutions in which plaintiff was involved and that he acted due to the potential disruption to criminal prosecutions and not in retaliation for plaintiff's speech. Accordingly, plaintiff's retaliation claim against the County Defendants is dismissed.

### 3. City Defendants

 Assuming plaintiff to have established a *prima facie* case against the City Defendants, plaintiff's retaliation claim must be dismissed because the City Defendants' interests outweighed plaintiff's First Amendment rights. Having determined that plaintiff's speech was of a matter of public concern, the Court must next balance "[plaintiff's] interest in making [his] statement against 'the interest of the [City], as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Pickering*, 391 U.S. 563, 88 S.Ct. 1731, 1734–35, 20 L.Ed.2d 811 (1968). An important consideration is whether the statement "impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin*, 483 U.S. 378, 107 S.Ct. at 2899 (citing *Pickering*, 391 U.S. 563, 88 S.Ct. at 1735–37). The government has the ·burden of demonstrating that the speech is likely to disrupt governmental operations. *Jeffries*, 52 F.3d at 13 (citing *Waters*, 511 U.S. 661, 114 S.Ct. at 1890). "[T]he closer the employee's speech reflects on matters of public concern, the greater must be the employer's showing that the speech is likely to be disruptive before it may be punished." *Id.* 52 F.3d at 13 (citing *United States v. Treasury Employees Union*, 513 U.S. 454, 115 S.Ct. 1003, 1021, 130 L.Ed.2d 964 (1995)).

 The Second Circuit has enunciated the following three-part test in evaluating the circumstances under which a government employer may take adverse employment action against an employee for speaking on a matter of public concern: "(1) if the employer's prediction of disruption is reasonable; (2) the potential disruptiveness is enough to outweigh the value of the speech; and (3) the

employer took action against the employee based on this disruption and not in retaliation for the speech." *Jeffries*, 52 F.3d at 13.

 The evidence before the Court demonstrates that the City's prediction of disruption is reasonable. "The public safety employer's determinations of both the potential for disruption as a result of the speech, as well as the employer's response to the actual or perceived disruption, are entitled to 'considerable judicial deference.'" *Tyler v. City of Mountain Home Arkansas*, 72 F.3d 568, 570 (8th Cir.1995) (quoting *Shands v. City of Kennett*, 993 F.2d 1337, 1345 (8th Cir.1993), *cert. denied*, 510 U.S. 1072, 114 S.Ct. 880, 127 L.Ed.2d 75 (1994)); *see Gasparinetti v. Kerr*, 568 F.2d 311, 315 (3d Cir.1977), *cert. denied*, 436 U.S. 903, 98 S.Ct. 2232, 56 L.Ed.2d 401 (1978); *Gordon v. Town of Hunter*, 1996 WL 77391, at *13 (N.D.N.Y. Feb.16, 1996) (McCurn, S.J.). Here, the KPD could reasonably conclude that the public's trust would be undermined if it believed that the officers employed to protect them were racially biased. Plaintiff was the head of the Narcotics Bureau for the City and had the responsibility for investigating drug activities in racially diverse areas. Plaintiff's racial slurs, overheard by Washington and ultimately published in newspaper articles, would tend to hamper the KPD's ability to provide for the public safety.

 The potential for disruption in the KPD outweighs the value of plaintiff's speech. The KPD provides an essential public function. Without the public's confidence, the KPD's effectiveness would be undermined. In an age when race relations often are tense, it is important that persons employed in governmental positions of authority, and particularly in law enforcement positions, not be viewed as prejudiced or biased. While "policeman . . . are not relegated to a watered-down version of constitutional rights," *Garrity v. New Jersey*, 385 U.S. 493, 87 S.Ct. 616, 620, 17 L.Ed.2d 562 (1967), and "freedom of speech is not traded for an officer's badge," *Biggs v. Village of Dupo*, 892 F.2d 1298, 1303 (7th Cir.1990), there is a

Kavanagh to believe that a jury would find plaintiff's investigations into criminal activity of Afri-

can–Americans suspect because of his apparent racial bias.

particular possibility for the disruption of police department operations by racist comments made by the head of an important police department (*e.g.,* the Narcotics Bureau), and the police have a significant interest in regulating the speech of its employees to ensure and promote public confidence. *See Tyler,* 72 F.3d at 570; *Shands,* 993 F.2d at 1344; *O'Donnell v. Barry,* 148 F.3d 1126, 1135 (D.C.Cir.1998). The District Attorney's decision to not use plaintiff as a witness exemplifies the potential disruption to the KPD. Balancing the potential disruption in this important governmental function with the marginal value ascribed to plaintiff's speech clearly tips the scale in favor of the City Defendants.

Lastly, the evidence demonstrates that the City Defendants acted based upon plaintiff's disruption, rather than in retaliation for his speech. There is no evidence demonstrating that the City suspended plaintiff in retaliation for making the speech.

### D. Unlawful Search and Seizure Claim

The essence of plaintiff's Fourth Amendment claim is that the defendants unlawfully obtained and distributed copies of the taped telephone conversation. The defendants move to dismiss that claim on the grounds that there was no government action involved in the taping of plaintiff's telephone conversation and that plaintiff had no reasonable expectation of privacy. Plaintiff responds that defendants violated 18 U.S.C. § 2510 *et seq.* (Wire Interception and Interception of oral Communications) which forms the basis for his Fourth Amendment claims.[7]

■ The Fourth Amendment's protection "against unreasonable searches and seizures" proscribes government action only. *United States v. Jacobsen,* 466 U.S. 109, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984). The Fourth Amendment "is wholly inapplicable 'to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official.'" *Id.* (quoting *Walter v. United States,* 447 U.S. 649, 100 S.Ct. 2395,

2404, 65 L.Ed.2d 410 (1980) (Blackmun, J., dissenting)); *United States v. Knoll,* 116 F.3d 994, 997 (2d Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1056, 140 L.Ed.2d 118 (1998).

■ In the present case, the evidence overwhelmingly demonstrates that neither the government nor a government agent was involved in the taping of plaintiff's telephone conversations. To the contrary, Washington acted on her own behalf as a private citizens. Washington stated at her deposition that nobody asked or encouraged her to tape record plaintiff's conversations. Washington Dep., at 86. The County and City Defendants were unaware that Washington was taping telephone calls that she had received over her personal scanner. There is no evidence demonstrating government involvement. *Knoll,* 116 F.3d at 996.

■ Further, because the telephone conversation had been recorded before any government involvement, plaintiff's "reasonable expectation of privacy [in the telephone conversation] had been defeated before any government involvement." *Knoll,* 116 F.3d at 998 (holding that plaintiff had no reasonable expectation of privacy in files stolen from his office before government involvement by burglars who were not acting as agents for the government when they stole the files). Accordingly, plaintiff has failed to demonstrate a violation of his rights under the Fourth Amendment. Lastly, the City and County Defendants were entitled to retain the tape recording for subsequent use, and such continued possession of the tape recording did not constitute an illegal seizure. *Knoll,* 116 F.3d at 998.

### E. Deprivation of a Liberty Interest Guaranteed by the Fourteenth Amendment

Plaintiff's Third Cause of Action alleges that defendants' conduct violated his right to liberty under the Fourteenth Amendment because defendants invaded his right of privacy. Defendants move to dismiss on the

---

7. Plaintiff has moved for leave to amend his complaint to assert a cause of action for a viola-

tion of 18 U.S.C. § 2510, *et seq.* This issue is discussed fully *infra* at § II(I).

ground that plaintiff cannot demonstrate that a government entity disclosed highly personal information. The County and City Defendants further claim that they released the information only after it had become public knowledge.

■ The Constitution protects two types of individual privacy interests: (1) "the individual interest in avoiding disclosure of personal matters", *Whalen v. Roe*, 429 U.S. 589, 97 S.Ct. 869, 876, 51 L.Ed.2d 64 (1977), or an interest in confidentiality, *Barry v. New York*, 712 F.2d 1554, 1559 (2d Cir.), *cert. denied*, 464 U.S. 1017, 104 S.Ct. 548, 78 L.Ed.2d 723 (1983); and (2) "the interest in independence in making certain kinds of important decisions," *Whalen*, 429 U.S. 589, 97 S.Ct. at 876, or an autonomy interest. *Barry*, 712 F.2d at 1559. There is nothing in the record before the Court to demonstrate that the autonomy interest is implicated here. None of the defendants' actions restricted plaintiff's ability to make important life decisions. Thus, the Court must determine whether plaintiff's privacy interest of confidentiality is implicated.

■ The Fourteenth Amendment "protects an individual's right to control the nature and extent of information released about that individual." *Bloch v. Ribar*, 156 F.3d 673, 683 (6th Cir.1998) (citing *Whalen*, 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64; *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977)). While "a constitutional right to nondisclosure of certain types of private information exists, [ ] not all disclosures of private information will trigger constitutional protection." *Id.* The right of privacy applies only to "personal matters." *Barry*, 712 F.2d at 1559. The question, then, is whether the content of plaintiff's telephone conversation with Bloom is the type of private, personal information subject to constitutional protection.

■ In *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976) and *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147, the Supreme Court stated that "the personal rights found in [the Fourteenth Amendment] guarantee of personal privacy must be limited to those which are 'funda-

mental' or 'implicit in the concept of ordered liberty' as described in *Palko v. Connecticut*, 302 U.S. 319, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937)." *Paul*, 424 U.S. 693, 96 S.Ct. at 1166. "The activities detailed as being within this definition [include] ... matters relating to marriage, procreation, contraception, family relationships, and child rearing and education. In these areas it has been held that there are limitations on the States' power to substantively regulate conduct." *Id.* Accordingly, courts have found privacy interests to be present in situations regarding disclosure of medical information or health matters, *Doe v. City of New York*, 15 F.3d 264, 267 (2d Cir.1994); sexual matters, *Bloch v. Ribar*, 156 F.3d 673, 685 (6th Cir.1998); materials that jeopardize an individual's interest in preserving his or her life and the lives of his or her family members, as well as preserving their personal security and bodily integrity, *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1062 (6th Cir.1998); and, arguably, in certain instances, disclosure of personal financial information. *Barry*, 712 F.2d at 1559. There is no personal privacy protection, on the other hand, for disclosure of an arrest, *Paul*, 424 U.S. 693, 96 S.Ct. at 1166; publication of convictions or registration on a list of sex offenders, *E.B. v. Verniero*, 119 F.3d 1077, 1103 (3d Cir.1997), *cert. denied*, — U.S. ——, 118 S.Ct. 1039, 140 L.Ed.2d 105 (1998); or any other materials beyond disclosure of medical, financial, and other intimately personal data. *Vega–Rodriguez v. Puerto Rico Tel. Co.*, 110 F.3d 174, 183 (1st Cir.1997); *Davis III v. Bucher*, 853 F.2d 718 (9th Cir.1988) (dissemination by corrections officer of nude photographs of inmates wife did not implicate personal privacy rights); *Henne v. Wright*, 904 F.2d 1208, 1215 (8th Cir.1990) (no right of privacy in giving child born out of wedlock surname of alleged father), *cert. denied*, 498 U.S. 1032, 111 S.Ct. 692, 112 L.Ed.2d 682 (1991). "[T]o violate [the] constitutional right of privacy the information disclosed must be either a shocking degradation or an egregious humiliation ... or a flagrant breach of a pledge of confidentiality which was instrumental in obtaining the personal information." *Alexander v. Peffer*, 993 F.2d 1348, 1350 (8th Cir. 1993) (disclosures on talk radio show of plain-

tiff's unsuccessful efforts to become police officer do not implicate personal privacy rights).

■ Here, among other things, plaintiff expressed his views on racial relations and African–Americans. Plaintiff's thoughts of African–Americans were openly communicated to a third-party, Bloom, and are not the type of fundamental privacy interest implicit in the concept of ordered liberty. *See Immediato v. Rye Neck Sch. Dist.*, 73 F.3d 454, 463 (2d Cir.1996), *cert. denied*, 519 U.S. 813, 117 S.Ct. 60, 136 L.Ed.2d 22 (1996); *Kuzma v. United States Postal Service*, 798 F.2d 29, 32 (2d Cir.1986), *cert. denied*, 479 U.S. 1043, 107 S.Ct. 906, 93 L.Ed.2d 856 (1987). Similarly, the release of the tapes did not constitute a shocking degradation, an egregious humiliation, or a flagrant breach of a pledge of confidentiality and did not concern personally intimate data. Accordingly, plaintiff's Fourteenth Amendment privacy claim is dismissed.

### F. Fourteenth Amendment Due Process Claims

Plaintiff's Third and Fifth Causes of Action claim deprivations of his liberty and property interests without due process of law under the Fourteenth Amendment. Defendants move to dismiss on the ground that plaintiff has not been deprived of a liberty or property interest. Plaintiff responds that he was constructively discharged and, therefore, denied a pre-deprivation hearing as required by New York Civil Service Law § 75.[8]

■ "In order to succeed on a claim of deprivation of procedural due process, a plaintiff must establish that state action deprived him of a protected property or liberty interest." *White Plains Towing Corp.*, 991 F.2d at 1061–62. Plaintiff "may have a liberty interest in [his] good name, and if [his] reputation is besmirched by governmental action, [he] may be entitled to a name-clearing hearing." *See Wisconsin v. Constantineau*, 400 U.S. 433, 91 S.Ct. 507, 510–11, 27 L.Ed.2d 515 (1971) ("Where a person's good

name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential."); *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 446 (2d Cir.1980). A person is not deprived of a liberty interest, however, merely because a government officer publishes defamatory remarks. Rather, the plaintiff must demonstrate a "stigma plus." That is, his liberty is in peril when governmental action places "on him a stigma or other disability that foreclose(s) his freedom to take advantage of other employment opportunities." *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548 (1972); *see Easton v. Sundram*, 947 F.2d 1011, 1016 (2d Cir.1991), *cert. denied*, 504 U.S. 911, 112 S.Ct. 1943, 118 L.Ed.2d 548 (1992). On the other hand, "property interests are 'created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'" *Luck v. Mazzone*, 52 F.3d 475, 477 (2d Cir.1995) (quoting *Roth*, 408 U.S. 564, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972)).

■ Here, plaintiff fails to demonstrate the existence or deprivation of a liberty interest. A review of the evidence reveals that plaintiff has not suffered a "stigma plus." Plaintiff has offered no evidence that he has been foreclosed of his freedom to take advantage of other employment opportunities. Further, plaintiff was scheduled to have a hearing on the matter, but opted to effectuate a settlement with the City whereby he agreed to retire from the KPD.

With respect to plaintiff's claim to a property interest in a civil-service protected job for which he cannot be terminated without a pre-deprivation hearing pursuant to New York Civil Service Law § 75, section 75 of the Civil Service Law does not guarantee a pre-deprivation hearing in all circumstances. For example, the City was permitted to suspend plaintiff for thirty days without pay

---

8. Section 75(1) of the New York State Civil Service Law provides, in relevant part, that:

A person ... shall not be removed or otherwise subjected to any disciplinary penalty provided in this section except for incompetency or misconduct shown after a hearing upon stated charges pursuant to this section.

based upon a charge of misconduct. N.Y.Civil Serv.Law § 75(3).[9] Further, plaintiff was not terminated, but voluntarily retired as part of a settlement with the City. Plaintiff certainly could have refused the settlement and proceeded to a grievance hearing.

Plaintiff, however, asserts that he was constructively discharged and that his resignation was not voluntary. Plaintiff's claim of constructive discharge is unavailing. Plaintiff has failed to demonstrate that a reasonable person in his circumstances would have felt compelled to resign. Plaintiff has proffered no evidence that defendants made his working conditions so intolerable that he was forced to involuntarily resign. *See Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 161 (2d Cir.1998). Plaintiff's conclusory allegations of a constructive discharge are patently insufficient to withstand defendants' motion to dismiss on this issue. As noted, plaintiff voluntarily resigned in connection with the settlement agreement entered into with the City in satisfaction of the misconduct charges brought against him. Thus, plaintiff was afforded the process due to ensure his liberty and property interests. *See Komlosi v. New York State Office of Mental Retardation and Developmental Disabilities*, 64 F.3d 810, 817 (2d Cir.1995); *Mustafa v. Clark County Sch. Dist.*, 157 F.3d 1169, 1179 (9th Cir.1998).

### G. Equal Protection and Human Rights Law Claims

Plaintiff's Fourth and Sixth Causes of Action claim violations of plaintiff's right to the equal protection of the laws as guaranteed by the Fourteenth Amendment and the New York State Human Rights Law (N.Y.Exec. Law § 296), respectively. Plaintiff did not discuss these causes of action in his opposition papers and, thus, has seemingly abandoned them. In any event, these claims are without merit.

Plaintiff does not claim that he is a member of a suspect class and has presented no evidence that defendants acted with any invidious discriminatory intent. Similarly, plaintiff has not demonstrated that race, or any other impermissible reason, was a substantial factor in the adverse employment action. *See Song v. Ives Laboratories, Inc.*, 957 F.2d 1041, 1045 (2d Cir.1992). Rather, the evidence unequivocally demonstrates that a charge of misconduct was filed against plaintiff based upon the offensive views expressed in the taped telephone conversation.

### H. State Law Claims[10]

Plaintiff also asserts state law claims under N.Y. PUBLIC OFFICERS LAW ART. 6–A, the Personal Privacy Protection Law ("PPPL"), and a common law claim for defamation. The claim under the PPPL must fail. First, the PPPL does not apply to the defendants herein because neither the District Attorney, the KPD, nor the individual defendants are an "agency" as defined by the PPPL.[11] Second, even if the PPPL did apply to the defendants herein, the tape recording

---

**9.** Section 75(3) provides, in part, that: "Pending the hearing and determination of charges of incompetency or misconduct, the officer or employee against whom such charges have been preferred may be suspended without pay for a period not exceeding thirty days."

**10.** Having dismissed the federal law claims, the Court ordinarily would lack jurisdiction over the remaining state law claims. *Castellano v. Board of Trustees of Police Officers' Variable Supplements Fund*, 937 F.2d 752, 758 (2d Cir.1991), *cert. denied*, 502 U.S. 941, 112 S.Ct. 378, 116 L.Ed.2d 329 (1991); *Buckley v. Consolidated Edison of New York, Inc.*, 155 F.3d 150, 152 (2d Cir.1998). Because, however, the Court is granting plaintiff's motion for leave to amend the Complaint to assert causes of action pursuant to

the Wiretap Statute, the Court retains jurisdiction over the state law claims.

**11.** The PPPL only prohibits "agencies" from disclosing certain records. Section 92(1) of the PPPL defines an "agency" as:

any state board, bureau, committee, commission, council, department, public authority, public benefit corporation, division, office or any other governmental entity performing a governmental or proprietary function for the state of New York, except the judiciary or the state legislature or any unit of local government and shall not include offices of district attorneys.

By the plain language of the statute, the PPPL certainly does not apply to the Ulster County District Attorney's Office and also is inapplicable to the KPD, which is a unit of local government.

is not a "record" as defined by the statute.[12] The New York State courts have held that "only records in an indexed computer database or the like are protected by the PPPL." *Matter of Spargo v. New York State Comm'n on Gov't Integrity*, 140 A.D.2d 26, 531 N.Y.S.2d 417 (3d Dept.), *leave denied*, 72 N.Y.2d 809, 534 N.Y.S.2d 667, 531 N.E.2d 299 (1988). The tape recording at issue here is not a record indexed in a computer database or the like.

Plaintiff also claims that Defendants Hardin and Clarke defamed him by making the following statements: "(1) "How many innocent black people have been sent to jail because of him"; (2) that plaintiff's expression of opinion on the tape "is a crime"; (3) that plaintiff is a "threat to the African–American community"; and (4) that plaintiff was a "bad officer" who had to be "weed[ed] out" of the KPD." Compl. ¶ 19. Defendant Clarke moves to dismiss this cause of action on the ground that the statements were true, the statements were constitutionally protected expressions of opinion, and Clarke did not act with malice. Defendant Hardin has not moved to dismiss the defamation cause of action.

■■■■ A plaintiff in a defamation action must demonstrate the following elements: (1) that defendants made a defamatory statement; (2) that the statement was published; (3) fault; and (4) injury. *See New York Times, Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 727, 11 L.Ed.2d 686 (1964). The degree of fault required to sustain a defamation claim depends upon the status of the plaintiff. *See generally id.* Where the plaintiff is a "public figure" or "public official", the plaintiff must demonstrate that the statements were made with actual malice (i.e. knowing falsity or reckless disregard for the truth). *Id.* Where, however, the plaintiff is not a public figure, but the alleged defamatory statements are arguably within the sphere of legitimate public concern which is reasonably related to matters warranting public exposition, the plaintiff must demonstrate that the publisher acted in a grossly irre-

sponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties. *See Chapadeau v. Utica Observer–Dispatch, Inc.*, 38 N.Y.2d 196, 199, 379 N.Y.S.2d 61, 341 N.E.2d 569 (1975).

■■■■ Plaintiff is a public figure with respect to alleged defamatory statements concerning his duty as a police officer. *See St. Amant v. Thompson*, 390 U.S. 727, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968) (accepting state supreme court determination that deputy sheriff was a public official); *Goldblatt v. Seaman*, 225 A.D.2d 585, 639 N.Y.S.2d 438 (2d Dept.1996) (police officer and personal body guard of well known family is a public figure); *Sweeney v. Prisoners' Legal Servs. of New York, Inc.*, 146 A.D.2d 1, 6, 538 N.Y.S.2d 370 (3d Dept.1989) ("[L]aw enforcement officers, in defamation actions involving their conduct as such, have consistently been held to be public officials.") (and cases cited therein), *rev'd on other grounds*, 84 N.Y.2d 786, 792, 622 N.Y.S.2d 896, 647 N.E.2d 101 (1995); *Malerba v. Newsday, Inc.*, 64 A.D.2d 623, 406 N.Y.S.2d 552, 554 (2d Dept.1978); *Orr v. Lynch*, 60 A.D.2d 949, 401 N.Y.S.2d 897 (3d Dept.1978), *aff'd*, 45 N.Y.2d 903, 411 N.Y.S.2d 10, 383 N.E.2d 562. Here, the alleged defamatory statements "concern[ ] acts or conduct 'which might touch on [plaintiff's] fitness for office' " and, therefore, the actual malice standard would apply. *Scacchetti v. Gannett Co.*, 123 A.D.2d 497, 507 N.Y.S.2d 337 (4th Dept.1986) (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345, 94 S.Ct. 2997, 3009, 41 L.Ed.2d 789).

■■■■ Clarke asserts that "her comments constituted fair comment on plaintiff's capacity to properly function as a KPD detective in light of his clearly racist comments and his expressed view that blacks are destined to a life of crime and will destroy any neighborhood into which they move." Clarke Memo. of Law, p. 20. Clarke also asserts that she did not know plaintiff and that certain of the statements attributed to her were misquotes. Thus, according to Clarke, the statements

---

12. A "record" means:

 any item, collection or grouping of personal information about a data subject which is maintained and is retrievable by use of the name or other identifier of the data subject.

were not false, she did not act with a reckless disregard for the truth, and she did not act with the intent to injure plaintiff. Plaintiff failed to respond to this issue and has failed to set forth any evidence demonstrating that Clarke acted with actual or common law malice. Because plaintiff has failed to demonstrate actual malice, the defamation action must be dismissed.

### I. Motion for Leave to Amend the Complaint

██ Plaintiff has cross-moved pursuant to FED.R.CIV.P. 15 for leave to amend the Complaint to include causes of action for violations of the Wiretap Statute, 18 U.S.C. § 2510, et seq., and Art. I., § 12 of the New York State Constitution. It is now axiomatic that leave to amend shall be freely granted unless it would be futile, cause undue delay or prejudice, or when it is sought in bad faith. *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). For the following reasons plaintiff is granted leave to amend the Complaint to assert a cause of action for violations of 18 U.S.C. § 2510, but denied with respect to the cause of action for a violation of Art. I., § 12 of the New York State Constitution.[13]

#### 1. Alleged Violations of 18 U.S.C. § 2510, et seq.

██ Although the defendants predictably claim that they will be prejudiced and that the amendment would be futile, the Court

disagrees. The alleged violation of 18 U.S.C. § 2511[14] arises out of the very same conduct as that alleged in the original Complaint. Further, much of the discovery conducted in the case would readily lend itself to a prosecution or defense of a claim pursuant to 18 U.S.C. § 2520.[15] Thus, there is no prejudice. Furthermore, as will be discussed, § 2520 applies to all cordless telephone conversations and, therefore, the amendment would not be futile.

██ Whether the 1994 amendments to Title III of the Omnibus Crime Control and Safe Streets Act of 1968 (the "Amendments") apply to *all* cordless telephones appears to be an issue of first impression. The Court has not found, and the parties have not presented, any case applying the Amendments to cordless telephone conversations. Defendants rely on a law review note in support of their contention that the Amendments should not apply to *all* cordless telephone conversations, but only to the newer generation of cordless telephones that have scrambling technology or other technologies that make it difficult to intercept the conversation. *See* Basil W. Mangano, Note, *The Communications Assistance for Law Enforcement Act and Protection of Cordless Telephone Communications: The Use of Technology as a Guide to Privacy,* 44 CLEV.ST.L.REV. 99, 119 (1996). The note concluded that "[i]f one reads [the] legislative history [of the Amendments] in conjunction with the legislative history of the [1986 Electronic Communications

---

13. Plaintiff failed to comply with the dictates of N.D.N.Y. Local R. 15 which requires "[a] party who moves for leave to amend a pleading [to] attach to the motion an unsigned copy of the proposed amended pleading." Accordingly, plaintiff is directed to serve and file an Amended Complaint asserting a cause of action pursuant to 18 U.S.C. § 2510 within 15 days of the date of this Memorandum—Decision & Order.

14. 18 U.S.C. § 2511 provides criminal penalties for any person who:

(a) intentionally intercepts, endeavors to intercept, or procures any other person to intercept, any wire, oral, or electronic communication; (b) intentionally uses, endeavors to use, or procures any other person to endeavor to use any electronic, mechanical, or other device to intercept any oral communication; ... (c) intentionally discloses, or endeavors to disclose, to any other person the contents of any wire,

oral, or electronic communication, knowing or having reason to know that the information was obtained [in violation of this section]; [or] (d) intentionally uses, or endeavors to use, the contents of any wire, oral or electronic communication, knowing or having reason to know that the information was obtained [in violation of this section].

Section 2520 provides a civil remedy for violations of § 2511.

15. 18 U.S.C. § 2520 provides, in relevant part, that:

Except as provided in section 2511(2)(a)(ii), any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter may in a civil action recover from the person or entity which engaged in that violation such relief as may be appropriate.

Privacy Act ("ECPA") ], which specifically states that Congress did not extend Title III protection to cordless telephones because they are so easily intercepted, it appears that there is no protection for convention cordless telephones." *Id.*, p. 119. While the author's reasoning may be supported by logic, it is contrary to the plain language of the statute.

Generally speaking, the ECPA provides protection to "wire communications" "electronic communications", and "oral communications." *See* 18 U.S.C. § 2510(1), (2), (12); 18 U.S.C. § 2511. The 1986 enactment expressly excluded the radio portion of a cordless telephone communication that is transmitted between the cordless telephone handset and the base unit from the definitions of a "wire communication" and an "electronic communication." *See* Pub.L. 99–508, § 101(a). The Courts refused to include cordless telephone conversations as "oral communications." *See United States v. Smith,* 978 F.2d 171, 178 (5th Cir.1992), *cert. denied,* 507 U.S. 999, 113 S.Ct. 1620, 123 L.Ed.2d 179 (1993). Thus, there was no protection to cordless telephones of any type.

In 1994, Congress amended the ECPA to remove the exception for cordless telephones from the definition of wire or electronic communications, P.L. 103–414, § 202(a), and amended the penalty provisions to include the interception of cordless telephones conversations. P.L. 103–414, § 202(b). Nothing in the statute or the legislative history indicates Congress' intent to protect modern, expensive, high-tech cordless phones with scrambling technology and not lower-cost, non-scrambling cordless telephones. To the contrary, Congress found that cordless telephones play an integral part of our society, that people expect that such telephone calls will be private and, accordingly, amended § 2511 to protect cordless telephone calls.[16] Congress succinctly stated that "[t]he [ECPA] . . . exempted from the protection of the Act 'the radio portion of a cordless telephone'. . . . The bill deletes the exceptions for cordless phones and imposes a penalty . . . for intentionally intercepting such communications." H.Rep. N. 103–827, 5 U.S.C.C.A.N. 1994, PL 103–414, pp. 3489, 3510.

Further, the language of § 2511(4)(b) demonstrates that Congress intended to cover all cordless telephone conversations. Section 2511(4)(b) provides that "[i]f the offense is a first offense . . . and is not for a tortious or illegal purpose or for purposes of . . . commercial advantage or private commercial gain, and the wire or electronic communication with respect to which the offense under paragraph (a) is *a radio communication that is not scrambled, encrypted, or transmitted using modulation techniques* . . . then . . . if the communication is the radio portion of . . . *a cordless telephone communication* that is transmitted between cordless telephone handset and the base unit . . . the offender shall be fined under this title." (emphasis supplied). This language makes it particularly clear that Congress did not intend to exempt non-scrambling, less sophisticated cordless telephones from the privacy protections. That Congress intended to include all cordless telephone conversations becomes particularly clear when one juxtaposes the amended version of § 2511(4)(b) with its predecessor. As originally enacted, § 2511(4)(b) covered only "cellular telephone communication[s]" and made no mention of cordless telephones. *Compare* P.L. 99–508, § 101(d)(2) with 18 U.S.C. § 2511(4)(b)(ii). Further, § 2511(4)(b) reveals that Congress was aware of the distinction in the types of cordless phones available. If Congress intended to include one type of cordless telephone, but not another, it could have expressly done so. Rather, Congress amended the statute to include all cordless telephones, regardless of their sophistication.

#### a. Defendant Clarke

Defendant Clarke further claims that this cause of action is futile because the record

---

**16.** The House Report specifically stated that "while the portion of cordless telephone communications occurring between the handset and the base unit was excluded from ECPA's privacy protections, the 1991 Privacy and Technology Task Force found that '[t]he cordless phone, far from being a novelty item used only at "poolside", has become ubiquitous . . . More and more communications are being carried out by people [using cordless phones] in private, in their homes and offices, with an expectation that such calls are just like any other phone call.' " H.Rep. No. 103–827, 5 U.S.C.C.A.N.1994, PL 103–414, p. 3497.

does not establish that she possessed the conscious objective to violate the statute, her distribution of the tape is protected by the First Amendment, and the statute cannot punish telephone conversations that do not affect interstate commerce.

 The Wiretap Statute is not violative of the First Amendment on its face. Clarke cites *In re: King World Productions*, 898 F.2d 56, 59 (6th Cir.1990), for the proposition that her First Amendment rights trump the ECPA. In *King World,* the court held that, under the circumstances of that case, the district court improperly authorized a prior restraint of the use of materials obtained allegedly in violation of § 2511. In particular the court found that the plaintiff could not demonstrate irreparable harm and, therefore, was not entitled to injunctive relief. The court expressly noted, however, that "our grant of this writ of mandamus is not intended to constitute an approval of the surreptitious means used to gather this information about [plaintiff], and in no way affects [his] ability to seek redress under New York state tort law and 18 U.S.C. § 2511." *Id.* 898 F.2d at 60. Clarke also cites *Boddie v. American Broadcasting Cos., Inc.*, 881 F.2d 267, 270 (6th Cir.1989), *cert. denied,* 493 U.S. 1028, 110 S.Ct. 737, 107 L.Ed.2d 755 (1990), for the proposition that the ECPA is unconstitutionally vague. However, *Boddie* dealt with a provision of the Wiretap Statute that is not at issue here. Further, Congress amended the Wiretap Statute to remove the Constitutionally offensive language. *Id.* 881 F.2d at 268.

Clarke also maintains that her actions are protected by the First Amendment because she was petitioning the government "to take action to repudiate plaintiff's racist comments." Clarke Reply Memo. of Law, p. 8. For the reasons that follow, the Court need not resolve this Constitutional issue.

 Clarke admits to having: (1) listened to the tape, and (2) disclosed the tape to the executive committee of the NAACP, the Ulster County District Attorney's Office, and

the KPD. July 22, 1998 Clarke Aff., ¶¶ 7–8. Section 2520 provides a civil cause of action for the intentional disclosure, 18 U.S.C. § 2511(1)(c), or use, 18 U.S.C. § 2511(1)(d), of a wire, oral, or electronic communication "knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection." 18 U.S.C. § 2511(1)(c), (d). Section 2520(c)(2) provides for the computation of damages for a violation of § 2511. That provision provides that:

> [T]he Court may assess as damages whichever is the greater of—
>
> > (A) the sum of the actual damages suffered by the plaintiff and any profits made by the violator as a result of the violation; or
> >
> > (B) statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000.[17]

For purposes of calculating statutory damages, "the number of disclosures [or uses] is irrelevant." *Romano v. Terdik*, 939 F.Supp. 144, 150 (D.Conn.1996) (citing *Rodgers v. Wood*, 910 F.2d 444, 446 (7th Cir.1990); *Dunn v. Blue Ridge Telephone Co.*, 868 F.2d 1578, 1582 (11th Cir.1989); *Menda Biton v. Menda*, 812 F.Supp. 283, 285 (D.Puerto Rico 1993); *Shaver v. Shaver*, 799 F.Supp. 576, 579 (E.D.N.C.1992)); *Deal v. Spears*, 780 F.Supp. 618, 624 (W.D.Ark.1991) (stating that $10,000 would be appropriate for multiple interceptions and another $10,000 for multiple disclosures), *aff'd,* 980 F.2d 1153 (8th Cir.1992). Thus, assuming, for purposes of discussion, liability under the statute, plaintiff could recover a maximum of $20,000 in damages as follows: (1) $10,000 for the violation of having "used" the tape, *see Thompson v. Dulaney*, 838 F.Supp. 1535, 1547 (D.Ut.1993) (listening to a tape constitutes a "use"), regardless of the actual number of uses, 18 U.S.C. § 2511(d); and (2) $10,000 for the violation of having "disclosed" the tape, regardless of the actual number of disclosures, 18 U.S.C. § 2511(c). *See*

---

**17.** There is nothing in the record demonstrating that plaintiff seeks actual damages. It cannot be seriously argued that plaintiff would be entitled to recover greater damages under the $100 per day formulation of statutory damages and, therefore, the Court need not address that computation of damages.

*Williams v. Poulos,* 11 F.3d 271, 290 (1st Cir.1993) ("[T]he disclosure and/or use of information obtained through a wrongful invasion amounts to a separate injury prohibited by statute, and makes a person subjected to such a disclosure and/or use 'a victim, once again, of a federal crime.'") (quoting *Gelbard,* 408 U.S. 41, 92 S.Ct. at 2362–2363); *Romano,* 939 F.Supp. at 150; *Deal v. Spears,* 980 F.2d 1153, 1156 n. 5 (8th Cir.1992); 18 U.S.C. § 2520(c)(2). Plaintiff may not receive statutory damages of $10,000 for each use or each disclosure. Thus, because Clarke used the tape and disclosed it to the NAACP, it is irrelevant for purposes of statutory damages that she later disclosed the tape to the Ulster County District Attorney and/or the KPD, and, thus, her Constitutional defense does not come into play under the circumstances of this case.

■■■ A genuine issue of material fact remains regarding whether Clarke violated § 2511; that is, whether she intentionally used, endeavored to use, disclosed, or endeavored to disclose any protected communication that she knew or had reason to know was obtained in violation of the Wiretap Statute. Clarke expressed her reservations regarding the legality of the tape, but nevertheless listened to it and disclosed it to the NAACP and others. Thus, this issue and the amount of any damages is for a jury.

■■■ Finally, Clarke maintains that the conduct at issue in the present case is wholly intrastate and, therefore, Congress is without authority to punish Clarke's conduct. This argument was expressly rejected in *United States v. Anaya,* 779 F.2d 532, 533 (9th Cir.1985) ("We hold that § 2511(1)(b)(ii) proscribes the interception of any oral communication, through the use of a device that transmits radio communications, interstate or intrastate. Therefore, a showing of an effect on interstate commerce is unnecessary."). In a challenge to a similar statute, the Supreme Court concluded that "as Congress has power, when necessary for the protection of interstate commerce, to regulate intrastate transactions, there is no constitutional requirement that the scope of the statute be limited so as to exclude intrastate communications." *Weiss v. United States,* 308 U.S. 321, 60 S.Ct. 269, 271, 84 L.Ed. 298 (1939) (holding that federal statute prohibiting interception and publication of communications is not limited to interstate communications, but also applies to wholly intrastate communications).

■■■ Clarke's reliance on *United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), is misplaced. *Lopez* recognized:

> three broad categories of activity that Congress may regulate under its commerce power.... First, Congress may regulate the use or channels of interstate commerce.... Second, Congress is empowered to regulate the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities.... Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relationship to interstate commerce.

*Id.* 514 U.S. 549, 115 S.Ct. at 1629–30 (internal citations omitted). Here, the Wiretap Statute passes muster under all of the above categories. Telecommunication and/or radio communications are, themselves, channels of interstate commerce. *See United States v. Miles,* 122 F.3d 235, 245 (5th Cir.1997) ("The meaning of the term 'channel of interstate commerce,' ... must refer to the navigable rivers, lakes, and canals of the United States; ... the interstate highway system; ... *interstate telephone and telegraph lines; ... [and] radio broadcast frequencies* ... on, over, and through which flow the goods, commodities, and information which constitute commerce between places in different states.") (DeMoss, J., concurring) (emphasis supplied). Telecommunications also arguably are instrumentalities of interstate commerce.[18] *See United States v. Nichols,* 928 F.Supp. 302, 312 (S.D.N.Y.1996) (electronic transfer of funds significantly involves interstate commerce), *aff'd,* 113 F.3d 1230 (2d Cir.1997). Finally, it was rational for Con-

---

**18.** It is commonplace for individuals and businesses alike to use telecommunications, for example, to trade stocks and sell and purchase goods interstate.

gress to conclude that telecommunications or radio communications substantially affect interstate commerce and, thus, enact the Wiretap Statute as part of the overall system of regulation of telecommunications and radio communication. *See United States v. Franklyn*, 157 F.3d 90, 95 (2d Cir.1998), *cert. denied*, —— U.S. ——, 119 S.Ct. 563, 142 L.Ed.2d 469 (1998). Accordingly, Congress was authorized to enact the Wiretap Statute and prohibit purely intrastate conduct. *Fry v. United States*, 421 U.S. 542, 95 S.Ct. 1792, 1795, 44 L.Ed.2d 363 (1975) ("Even activity that is purely intrastate in character may be regulated by Congress, where the activity, combined with like conduct by others similarly situated, affects commerce among the States or with foreign nations."); *Lopez*, 514 U.S. 549, 115 S.Ct. at 1629 (stating that a court's function is to ascertain "whether a rational basis existed for [Congress's] concluding that a regulated activity sufficiently affected interstate commerce."). Furthermore, unlike in *Lopez*, the Wiretap Statute contains a jurisdictional element relating to interstate commerce. In particular, "wire communications" are defined to include "any aural transfer made . . . through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection . . . furnished or operated by any person engaged in providing or operating such facilities for the transmission of interstate . . . commerce . . . or communications affecting interstate commerce. . . ." 18 U.S.C. § 2510(1). Here, plaintiff made an "aural transfer," [19] made through the use of telephone lines which are operated by entities

providing for the transmission of interstate commerce. Thus, the activity at issue, even if wholly intrastate in the present case, is substantially related to interstate commerce and Congress has the authority to regulate such conduct.

**b. The City and County Defendants**

The City and County Defendants further argue that amending the Complaint would be futile because their conduct is exempt from the Wiretap Statute. Specifically, these defendants maintain that 18 U.S.C. § 2517(1) and (2) authorize them to disclose the tape to and within the KPD for investigation purposes. Defendants further assert that they are immune from liability because they disclosed the tape to the media after it had become common knowledge.

■ Defendants rely on *Forsyth v. Barr*, 19 F.3d 1527 (5th Cir.1994), *cert. denied*, 513 U.S. 871, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994), for the argument that they were permitted to use and disclose the tape to the KPD pursuant to 18 U.S.C. § 2517(1) and (2).[20] The *Forsyth* court concluded that "disclosure and use under § 2517(1) and (2) of unlawfully intercepted information that is otherwise conveyed lawfully to law enforcement officers is permitted; in sum, that information disclosed or used under those subsections need not be only that which is intercepted 'in accordance with' the Act." *Id.* 19 F.3d at 1543. In coming to this conclusion, the *Forsyth* court believed that the phrase "by any means authorized by this chapter" used in § 2517(1) and (2) was not

---

**19.** "Aural transfer" is defined to mean "a transfer containing the human voice at any point between and including the point of origin and the point of reception." 18 U.S.C. § 2510(18).

**20.** This statute provides, in relevant part, that:
(1) Any investigative or law enforcement officer who, *by any means authorized by this chapter*, has obtained knowledge of the contents of any wire, oral, or electronic communication, or evidence derived therefrom, may disclose such contents to another investigative or law enforcement officer to the extent that such disclosure is appropriate to the proper performance of the official duties of the officer making or receiving the disclosure.
(2) Any investigative or law enforcement officer who, *by any means authorized by this chap-*

*ter*, has obtained knowledge of the contents of any wire, oral, or electronic communication or evidence derived therefrom may use such contents to the extent such use is appropriate to the proper performance of his official duties. (3) Any person who has received, *by any means authorized by this chapter*, any information concerning a wire, oral, or electronic communication, or evidence derived therefrom intercepted *in accordance with the provisions of this chapter* may disclose the contents of that communication or such derivative evidence while giving testimony under oath or affirmation in any proceeding held under the authority of the United States or of any State or political subdivision thereof . . . (emphasis supplied).

the equivalent of the phrase "in accordance with the provisions of this chapter" found in § 2517(3). *Id.* According to the court, if these phrases were read to have an identical meaning, then the use of both of these phrases in § 2517(3) "would render the latter phrase superfluous." *Id.* 19 F.3d at 1543. The Fifth Circuit also relied on an excerpt from the legislative history which provides that:

> Neither paragraphs (1) nor (2) are limited to evidence intercepted in accordance with the provisions of the proposed chapter, since in certain limited situations disclosure and use of illegally intercepted communications would be appropriate to the proper performance of the officers' duties. For example, such use and disclosure would be necessary in the investigation and prosecution of an illegal wiretapper himself.

S.Rep. No. 90–1097, *reprinted in* 1968 U.S.C.C.A.N. 2112, 2188. The Fifth Circuit apparently believed that law enforcement may use illegally intercepted communications provided they took no part in the illegal interception. In *United States v. Murdock,* 63 F.3d 1391, 1404 (6th Cir.1995), *cert. denied,* 517 U.S. 1187, 116 S.Ct. 1672, 134 L.Ed.2d 776 (1996), the Sixth Circuit reached a similar result recognizing a clean hands exception allowing for the introduction of evidence obtained by an illegal wiretap where the government took no part in the interception.

In *Berry v. Funk,* 146 F.3d 1003 (D.C.Cir. 1998), the defendant law enforcement officers argued that they were entitled to use and disclose the contents of illegally intercepted telephone conversations because they neither participated in nor sponsored the interception. The *Berry* court held that § 2517(1) and (2) did not authorize a law enforcement officer to disclose or use the contents of any wire, oral, or electronic communication where those law enforcement officers knew or had reason to know that the information was obtained through the interception of a com-

munication in violation of the Wiretap Statute. *Id.* 146 F.3d at 1012.

The Ninth Circuit reached a similar result in *Chandler v. United States Army,* 125 F.3d 1296 (9th Cir.1997). The Ninth Circuit rejected, in part, the reasoning in *Forsyth. Chandler,* 125 F.3d 1296, 1300. The Ninth Circuit did not find any ambiguity or superfluity in the use of the phrases "by any means authorized by this chapter" together with "in accordance with the provisions of this chapter" in § 2517(3). Rather, the Ninth Circuit found that "[t]here are situations where law enforcement officers could gain knowledge of the contents of a wiretap by authorized means, even though the interception was not in accordance with the law. One way is lack of scienter ... [I]f the law enforcement officer gains knowledge of the contents of the wiretap, without knowing that it was obtained by a violative interception, then the officer has obtained knowledge by an authorized means." *Id.* 125 F.3d at 1300.[21] The Ninth Circuit, thus, concluded that "[w]e agree with the Fifth Circuit that if the police innocently receive what is in fact the contents of illegally intercepted communications, they may use and disclose it among themselves. . . . . That does not conflict with our conclusion, that if law enforcement officers gain knowledge of the contents of an intercepted communication, aware of the unlawful interception, they may not use and disclose it." *Id.* 125 F.3d at 1301. The Ninth Circuit also rejected *Murdock,* stating that "the purpose of the statute is to prevent private, not just governmental, wiretapping [and] we cannot reconcile the Sixth Circuit reading with the statutory language." *Id.* At 1302.

As noted by the Fifth Circuit, "construction of the Wiretap Act is fraught with trip wires." *Forsyth,* 19 F.3d at 1541–43. It is difficult to reconcile the various phrases used in § 2517. This Court believes that a plain reading of § 2517 in conjunction with the purpose behind the legislation evinces that Congress did not intend to except illegally obtained information that is provided to law

---

**21.** Recall that the Wiretap Statute only prohibits a person from using or disclosing communications where that person knows or has reason to know that the information was obtained in violation of the statute. 18 U.S.C. § 2511.

enforcement officers when those officers know the information to have been obtained in violation of the Wiretap Statute. As the Second Circuit has stated:

> [The Wiretap Statute] was the culmination of a long battle between those who would altogether prohibit wiretaps and the material obtained thereby and those who wanted to allow the government to use wiretap material in criminal prosecutions. In the resulting statute, Congress recognized that wiretapping could be highly intrusive of privacy; the legislation therefore specifically put strict limits on wiretapping and on how it could be used. *See* S.Rep. No. 1097, 90th Cong., 2s Sess. 67, 161–65, reprinted in 1968 U.S.C.C.A.N. 2112, 2154, 2222–27. In construing the statute, it should always be remembered that "although Title III authorizes invasions of individual privacy under individual circumstances, the protection of privacy was an overriding congressional concern."

*Nat. Broadcasting Co. v. United States Dep't of Justice,* 735 F.2d 51, 53. (2d Cir.1984) (quoting *Gelbard v. United States,* 408 U.S. 41, 92 S.Ct. 2357, 2361, 33 L.Ed.2d 179 (1972)). The First Circuit aptly noted that "an invasion of privacy is not over when an interception occurs, but is compounded by disclosure in court or elsewhere. The impact of this second invasion is not lessened by the circumstance that the disclosing party (here, the government) is merely the innocent recipient of a communication illegally intercepted by the guilty interceptor." *United States v. Vest,* 813 F.2d 477, 481 (1st Cir.1987); *see In re Grand Jury,* 111 F.3d 1066, 1077 (3d Cir.1997) (rejecting clean hands exception). It is, thus, clear that important issues of privacy abound whenever communications are illegally intercepted, regardless of who possesses the information regarding that communication. There is no less of a privacy concern simply because the government, without any fault of its own, has obtained information regarding the contents of an illegally intercepted communication.

The Second Circuit has read subsections (1) and (2) as "allow[ing] law enforcement officials who have permissibly gained knowledge of the contents *of authorized intercep-* *tions* to use those contents and disclose them to another officer to the extent necessary for the performance of official duties." *United States v. Maldonado–Rivera,* 922 F.2d 934, 954 (2d Cir.1990) (emphasis supplied), *cert. denied,* 501 U.S. 1211, 111 S.Ct. 2811, 115 L.Ed.2d 984 (1991). "The contents of a communication that was 'unlawfully intercepted' are to be suppressed." *Id.* (citing 18 U.S.C. § 2518(10)(a)). A plain and fair reading of the statute evinces that Congress intended to limit law enforcement officers' use or disclosure of information that was lawfully obtained. *See* 18 U.S.C. § 2517. Because of the serious privacy concerns involved even in a *legal* wiretap, Congress sought to impose limits upon the use of information derived therefrom. These limitations are contained in § 2517. *See Maldonado–Rivera,* 922 F.2d at 954; *United States v. Johnson,* 539 F.2d 181, 186 (D.C.Cir.1976) ("[Section 2517] describes the uses properly to be made, by law enforcement officers and others, of information acquired under a federally authorized intercept."), *cert. denied,* 429 U.S. 1061, 97 S.Ct. 784, 50 L.Ed.2d 776 (1977); *United States v. Hall,* 543 F.2d 1229, 1233 (9th Cir. 1976), *cert. denied,* 429 U.S. 1075, 97 S.Ct. 814, 50 L.Ed.2d 793 (1977) ("[W]e view the [subsections] as designed to protect the public from unnecessarily widespread dissemination of the contents of interceptions and from the wholesale use of information gleaned from a legal wiretap by an officer state or federal for personal or illegal purposes.") (emphasis supplied), *cert. denied,* 429 U.S. 1075, 97 S.Ct. 814, 50 L.Ed.2d 793 (1977).

Thus, § 2517 does not insulate the City or County Defendants from liability unless they can demonstrate that they obtained the tape recordings "by any means authorized by this chapter" or, of course, unless they demonstrate that they did not have the requisite degree of knowledge to invoke § 2511.

The Court also rejects the County Defendants' assertion that they are insulated from liability for disclosing the tape because the contents of the tape had become common knowledge. The County Defendants both used and disclosed the tape recordings to the KPD *before* the media reports. As previously noted, for purposes of statutory damages,

there is only one violation of the statute for disclosing an impermissibly intercepted communication regardless of the actual number of disclosures. Similarly, there is but one violation of the statute for using impermissible intercepted tapes, regardless of the actual number of uses. Thus, it is irrelevant for purposes of this motion whether the contents of the tape recordings had become common knowledge *after* it had been used and disclosed by the County Defendants. Triable issues of fact remain regarding whether the City and/or County Defendants knew that the tape had been obtained in violation of the Wiretap Statute, which City Defendants used or disclosed the tape recording, and whether the contents of the tape had, indeed, become public knowledge at the time of disclosure.

## 2. New York State Constitution, Art. I, § 12

Defendants also argue that plaintiff's motion for leave to amend the Complaint to assert a cause of action based upon Article I, § 12 of the New York State Constitution should be denied as futile. They argue that state action is required to establish a violation of Article I, § 12 and that such action is lacking here.

Article I, § 12 is New York's counterpart to the Fourth Amendment. Section 12 contains two paragraphs. The first paragraph, like the Fourth Amendment, protects people against unreasonable searches and seizures. The second paragraph, unlike the Fourth Amendment, provides that:

> The right of the people to be secure against unreasonable interception of telephone and telegraph communications shall not be violated, and ex parte orders or warrants shall issue only upon oath or affirmation that there is reasonable ground to believe that evidence of crime may thus be obtained....

Generally speaking, state action is required·to establish a violation of constitutional rights. *See SHAD Alliance v. Smith Haven Mall,* 66 N.Y.2d 496, 500, 498 N.Y.S.2d 99, 101, 488 N.E.2d 1211 (1985). While certain provisions of the State Constitution also proscribe private conduct, *see Brown v. State,* 89 N.Y.2d 172, 182, 652 N.Y.S.2d 223, 229, 674 N.E.2d 1129, it is clear that Article 1, § 12 applies only to government conduct. *Ritterband v. Axelrod,* 149 Misc.2d 135, 562 N.Y.S.2d 605, 610 (1990) ("The above constitutional provisions protect only against 'unreasonable' searches and seizures by government."); *see People v. La Borde,* 277 A.D. 43, 45, 97 N.Y.S.2d 807, 810 (2d Dept.1950) ("The provisions of article I, section 12, State Constitution, ... relate solely to the sovereign authority and its agencies and not to individuals...."), *aff'd,* 301 N.Y. 738, 95 N.E.2d 410 (1950). Because there was no government action in connection with the interception of the telecommunications, there can be no violation of Article I, § 12 of the New York State Constitution. *See also* discussion *supra* regarding the Fourth Amendment.

## J. Third–Party Defendant's Motion for Summary Judgment

Defendant Washington filed a Third–Party Complaint against the NAACP, the Ulster County Branch of the NAACP, and Clarke individually and as president of the Ulster County Branch of the NAACP for indemnification of all sums for which Washington may be liable, attorneys' fees, and costs and disbursements incurred in defending this action.[22] The Third–Party Defendants now move for summary judgment seeking dismissal of the Third–Party Complaint on the grounds that there was no express agreement to defend and indemnify, Clarke did not have the authority to bind the NAACP to an agreement to defend and indemnify, and there is no basis for an implied right of indemnification.

---

**22.** Washington also named the New York State Conference of NAACP Branches and Hazel Dukes, individually and as president of the New York State Conference of NAACP Branches as Third–Party Defendants. In his affidavit in opposition to the Third–Party Defendants' motion for summary judgment, Washington's attorney states that "the claims against the New York State Conference of NAACP Branches [and] Hazel N. Dukes, individually and as President of the New York State Conference of NAACP Branches should be dismissed." August 19, 1998 Aff. Of Frederick C. Riester, ¶ 13. Thus, the Third–Party Complaint is dismissed as to those Third–Party Defendants.

**120**

Washington responds that there is a question of fact whether Clarke agreed to defend and indemnify Washington and whether Clarke had the authority to bind the NAACP. Specifically, plaintiff claims that she made it explicitly clear to Clarke that she wanted to be protected from "repercussions" for having made the tape. Plaintiff further asserts that Clarke guaranteed her that nothing was going to happen to her for having recorded the conversations, that the NAACP would back her from beginning to end and that the NAACP would protect her for having recorded the conversations. According to plaintiff, in reliance on Clarke's guarantees of protection, she agreed to give Clarke a copy of the tape.

 "In the absence of a duty to indemnify imposed by law, a[ ] party has no right to be indemnified unless the right is contractually-derived." *Haynes v. Kleinewefers and Lembo Corp.*, 921 F.2d 453, 456 (2d Cir.1990). Since there is no such legal duty here, plaintiff must demonstrate a contractually-derived obligation. "Express language need not be used as long as the contract demonstrates an 'unmistakable intent' to indemnify...." *Id.* (quoting *Kurek v. Port Chester Housing Auth.*, 18 N.Y.2d 450, 456, 276 N.Y.S.2d 612, 223 N.E.2d 25 (1966)). Such an unmistakable intent may be implied from the purpose and language of the entire agreement. *See Hogeland v. Sibley, Lindsay & Curr Co.*, 42 N.Y.2d 153, 397 N.Y.S.2d 602, 366 N.E.2d 263 (1977). A court must be careful, however, not to imply too much. "When a claim is made that a duty to indemnify is imposed by an agreement, that agreement must be strictly construed so as not to read into it any obligations the parties never intended to assume." *Haynes*, 921 F.2d at 456 (citing *Levine v. Shell Oil Co.*, 28 N.Y.2d 205, 211, 321 N.Y.S.2d 81, 269 N.E.2d 799 (1971)). Thus, an "intention to indemnify must be clearly implied from the language and purposes of the entire agreement, and the surrounding facts and circumstances." *Margolin v. New York Life Insurance Company*, 32 N.Y.2d 149, 153, 344 N.Y.S.2d 336, 297 N.E.2d 80 (1973).

 The difficulty for Washington in the present case is that there is no written contractual agreement. Rather, she relies on various conversations with Clarke. The evidence before the Court demonstrates that Washington never expounded upon her fear of repercussions and never expressed to Clarke that she required a defense and/or indemnification. In fact, there is no evidence that she and Clarke ever discussed the NAACP's defending or indemnify her with respect to any litigation resulting from the tapes.

Similarly, Washington has not proffered any evidence demonstrating a clear understanding between she and Clarke and/or the NAACP of how the NAACP would "protect" her from repercussions. The evidence demonstrates that the NAACP attempted to protect Washington by concealing her identity. The NAACP declined to disclose the source of the tape recordings when it provided a copy to the District Attorney and the KPD. In fact, Clarke concocted a story that she found the tape in her mailbox to protect Washington's identity. While Washington may have expected that the NAACP would provide her with a legal defense and indemnification, her unilateral expectation does not suffice. There simply is insufficient evidence before the Court of an unmistakable understanding between the parties that the NAACP or Clarke would defend and/or indemnify Washington and, thus, no such agreement can be found.

 Lastly, Washington cannot recover under a theory of implied indemnity, because her liability is not vicarious. *See Harris v. Standard Acc. and Ins. Co.*, 297 F.2d 627, 635 (2d Cir.1961) (The contract of indemnity implied by law in favor of one who is legally liable for the negligence of another covers loss or damage, and not mere liability.) (citations omitted), *cert. denied*, 369 U.S. 843, 82 S.Ct. 875, 7 L.Ed.2d 847 (1962); *Brown v. Two Exchange Plaza Partners*, 76 N.Y.2d 172, 178, 556 N.Y.S.2d 991, 556 N.E.2d 430 (1990) (theory of implied indemnity arises out of vicarious liability only); *Mas v. Two Bridges Assocs.*, 75 N.Y.2d 680, 690, 555 N.Y.S.2d 669, 554 N.E.2d 1257 (1990) ("Generally, [implied indemnity] is available in favor of one who is held responsible solely by operation of law because of his relation to the actual wrongdoer...."). There are no equitable principles at play here that would dictate a granting of relief in favor of Washington. *See McDermott v. City of New York*, 50

N.Y.2d 211, 217, 428 N.Y.S.2d 643, 406 N.E.2d 460 (1980). ("[I]mplied indemnification ... recognize[s] that a person who ... has discharged a duty which is owed by him but which as between himself and another should have been discharged by the other, is entitled to indemnity. To prevent unjust enrichment, courts have assumed the duty of placing the obligation where in equity it belongs.... The rule developed that where payment by one person is compelled, which another should have made, a contract to reimburse or indemnify is implied by law.") (internal quotations and citations omitted).

## III. CONCLUSION

For the foregoing reasons Plaintiff's First, Second, Third, Fourth, Fifth, Sixth, and Seventh Causes of Action are DISMISSED in their entirety. Plaintiff's Eight Cause of Action is DISMISSED as to Clarke. Plaintiff is granted leave to file and serve an Amended Complaint to include a cause of action pursuant to 18 U.S.C. § 2520 within fifteen days of the date of this Memorandum–Decision & Order. In the event plaintiff fails to file an Amended Complaint, the Eighth Cause of Action against Hardin will be dismissed for lack of jurisdiction. See 28 U.S.C. § 1367(c)(3); *Castellano,* 937 at 758. **IT IS SO ORDERED.**